This cause was heard upon the record in the trial court. Each error assigned has been reviewed and the following disposition is made:
Appellant, Tiffney Jordan ("Tiffney"), appeals from the decision of the Summit County Court of Common Pleas, Juvenile Division, which terminated her parental rights to her sons Cory Jordan ("Cory") and Adrian Williams ("Adrian") and awarded permanent custody to the Summit County Children Services Board ("CSB"). Appellee, Brian Kasserman ("Kasserman"), Cory's biological father, filed a cross appeal. We affirm.
 I.
Tiffney is the biological mother of four children,[1] only two are at issue in this appeal: Adrian, born May 3, 1999 and Cory, born July 12, 1991. CSB first became involved with Tiffney in May 1999, following a referral which alleged that Tiffney was abusing drugs and alcohol. Tiffney admitted to using marijuana and cocaine during her pregnancy with Adrian. After Adrian's birth, the children initially remained in her custody, and Tiffney voluntarily agreed to seek treatment at the Community Health Center ("CHC").[2]
On July 1, 1999 Tiffney was arrested on misdemeanor child endangering and domestic violence charges for striking her six year old child, Cody. Tiffney pleaded guilty to the charge of endangering children. On September 23, 1999, the trial court convicted her of endangering children. On October 8, 1999, CSB filed for temporary emergency custody of the children due to a variety of factors such as the inconsistency of Tiffney's treatment at CHC, Tiffney's relapse into cocaine use, and the fact that the family was facing eviction. The juvenile court granted emergency temporary custody and placed Adrian with a foster family and placed Cory with his maternal aunt.
On December 3, 1999, the juvenile court adjudicated the children neglected and dependent. The court placed Adrian and Cody in the temporary custody of CSB on December 23, 1999. On March 6, 2001, CSB moved for permanent custody of Adrian. CSB then moved for permanent custody of Cory on April 4, 2001. CSB moved to postpone the permanent custody hearing for six months because the biological parents were showing potential to make progress on their case plan.
On June 5, 7, 11, 26, and August 15, 2001, the permanent custody hearing was held before the trial court. Prior to the hearing, Kasserman withdrew his motion for custody of Cory. On September 5, 2001 the juvenile court awarded permanent custody of Cory and Adrian to CSB. Tiffney timely appeals and raises five assignments of error. Appellee Kasserman raises one assignment of error.[3]
 II. Tiffney's First Assignment of Error THE TRIAL COURT'S DETERMINATION THAT AN ORDER OF PERMANENT CUSTODY TO SUMMIT COUNTY CHILDREN SERVICES BOARD WAS IN THE BEST INTEREST OF THE CHILDREN WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE[.]
In her first assignment of error, Tiffney asserts that the order awarding permanent custody of Cory and Adrian to CSB was against the manifest weight of the evidence. We disagree.
When evaluating whether a judgment is against the manifest weight of the evidence in a juvenile court, the standard of review is the same as that in the criminal context. In re Ozmun (Apr. 14, 1999), Summit App. No. 18983, unreported, at 3. In determining whether a criminal conviction is against the manifest weight of the evidence:
 [t]he court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [trier of fact] clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.
State v. Thompkins (1997), 78 Ohio St.3d 380, 387, quoting Statev. Martin (1983), 20 Ohio App.3d 172, 175.
Termination of parental rights is an alternative of last resort, but is sanctioned when necessary for the welfare of a child. In re Wise (1994),96 Ohio App.3d 619, 624. Before terminating parental rights and awarding a moving agency permanent custody of a child, who is neither abandoned nor orphaned, the juvenile court must find clear and convincing evidence of both prongs of the statutory test: (1) that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent or that the child has been in the temporary custody of the agency for more than twelve of the last twenty-two months and (2) that the grant of permanent custody to the agency is in the best interest of the child, based on an analysis under R.C. 2151.414(D). See R.C.2151.414(B)(1); see, also, In re William S. (1996), 75 Ohio St.3d 95,99. Clear and convincing evidence is that which will produce in the trier of fact "`a firm belief or conviction as to the facts sought to be established.'" In re Adoption of Holcomb (1985), 18 Ohio St.3d 361,368, quoting Cross v. Ledford (1954), 161 Ohio St. 469, paragraph three of the syllabus.
Tiffney does not dispute that the first prong of the test was satisfied because Cory and Adrian had been in the temporary custody of CSB for more than twelve of the twenty-two consecutive months prior to the hearing. Her first assignment of error pertains to the trial court's finding that permanent custody to CSB was in children's best interest. When determining whether a grant of permanent custody is in the child's best interest, the juvenile court must:
 consider all relevant factors, including, but not limited to, the following:
 (1) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;
 (2) The wishes of the child, as expressed * * * through the child's guardian ad litem[;]
 (3) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period ending on or after March 18, 1999; [and]
 (4) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;
 (5) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.
R.C. 2151.414(D)(1)-(5). Although the trial court is not precluded from considering other relevant factors, the statute explicitly requires the court to consider all of the enumerated factors.
Witnesses who testified at the hearing included Tiffney Jordan, Adrian and Cory's biological mother; Travis Williams, Adrian's biological father; Diane Knapp, Adrian and Cory's foster mother; Deborah Walsh, a psychologist; Kelly Tabellion, an occupational therapist; Lori Long, a counselor with the CHC; Christine Cooper, an intern with Portage Path Behavioral Health Care; Julie Dustman, a protective supervisor with CSB; Jacqueline Abrams-Rodkey, a protective unit case worker with CSB; Attorney Rex Payne, Adrian and Cory's guardian ad litem; Michellene Keppler, a friend of Tiffney; Darryal Williams, Travis's nephew; and Denise Griffin, Mr. Williams' fiancée. Based on this testimony, the following evidence was established at the permanent custody hearing.
Tiffney is a crack cocaine addict. After a referral to the CHC in February 1999, Long began counseling Tiffney. Tiffney admitted to using crack cocaine and marijuana during the first trimester of her pregnancy with Adrian.[4] In addition to providing Tiffney with various treatment recommendations, Long suggested opening a case plan with CSB. Initially, Tiffney's involvement with CSB was voluntary, meaning there was an agreement to cooperate with CSB without the need for court orders. After establishing a case plan with CSB, Tiffney admitted to a relapse. On October 8, 1999, Julie Dustman, a protective supervisor with CSB, sought a court order, removed Adrian and Cory from Tiffney and placed them in the temporary custody of CSB.
The complaint for temporary, emergency custody states that: 1) Tiffney admitted to using cocaine, entered counseling with CHC, failed to consistently comply with treatment, relapsed and failed to complete an intensive outpatient program, 2) Tiffney is three months behind in her rent and in the process of being evicted, 3) Tiffney was convicted of child endangering, in violation of R.C. 2919.22, for striking her oldest son, Cody, 4) Tiffney's son, Cory, has been tardy or missed several days of school while in the care of his mother, and 5) Tiffney failed to fill a prescription to treat Cory's recent tooth infection.
Several witnesses for CSB testified that in addition to Tiffney's substance abuse problems, she also suffers from a severe depressive disorder. Long opined that Tiffney could be successful in treatment if her mental health issues were addressed. The record reflects that Tiffney is currently taking medication to control her depression. She has also recently had her first appointment with a new counselor at Portage Path Behavioral Health Care and plans to continue seeing him for substance abuse and mental health counseling.
Adrian was 25 months old and Cory was almost 10 years old at the time of the permanent custody hearing. The record indicates that both children have been in the temporary custody of the agency for a consecutive 20 month-period. Both children are in foster care living with the Knapp family. Adrian has been with Knapp family the entire 20 month-period. However, Cory was initially placed with his Aunt Tootie.[5] After living with this relative for four months, Aunt Tootie requested other placement for Cory because she was planning on having major surgery. CSB placed Cory with the Knapp family.
Mrs. Knapp is a licensed foster parent. Mr. and Mrs. Knapp live with their two biological children and four foster children (including Adrian and Cory). While living with the Knapp family, Cory has adapted to a daily routine of school, homework, chores and free time. He has bonded with the Knapp's 12-year-old child. The two boys often play video games together. Cory is very involved in family activities and gets along with all of the children in the house. He is currently in third grade and receiving all A's and B's. Cory is also involved in a church group called the Royal Rangers that conducts group activities similar to the boy scouts.
Adrian is a child with special needs, and he requires constant supervision. Adrian was diagnosed with a mild case of cerebral palsy, a seizure disorder and developmental delay. Adrian has weekly appointments with an occupational therapist, a speech therapist and a psychologist who focuses on behavioral management. Every three months he has an appointment with his neurologist, Dr. Timmons.
The occupational therapist testified that her goals for Adrian were: 1) to diminish his emotional outbursts and 2) to encourage participation in age appropriate (24 months old) fine motor skills. She described Adrian as a child with no concept of himself or things in his environment. Adrian is tactilely defensive and can become upset at the sight of a tissue.
Adrian sensory issues result in tantrums and sudden outbursts. He also exhibits rage and uncontrollable self-injuring behaviors. Mrs. Knapp and her husband perform several activities as follow up treatment to Adrian's various weekly appointments. Mrs. Knapp applies "brush therapy" to Adrian every two hours throughout the day to help him deal with his sensory issues and "deep pressure" to calm Adrian. Brush therapy is a specific protocol performed by using a surgical scrub brush in contact with the child's back, arms and legs. Deep pressure is a technique performed by pushing down on the child's shoulders or hip joints to create proprioceptive input that is calming to the child.
Mrs. Knapp taught Adrian sign language for communication because he was not able to speak when he first joined their family. The entire family also learned sign language. Adrian occasionally plays with the other children in the home but he does not initiate the play. He especially enjoys playing with the family dog. Mrs. Knapp testified that Adrian requires constant supervision "[a]n adult must be with him, my husband or I, at all times." In spite of the challenges posed by Adrian's special needs, Mr. and Mrs. Knapp wish to be considered for adoption of Adrian and Cory.
Deborah Walsh is a psychologist who is currently counseling Cory. Walsh helped Cory adjust to the transition between living with his Aunt Tootie and living with his foster family. After being placed with the Knapp family, Cory exhibited several delayed behaviors which included soiling his pants. Cory experienced a close relationship with his Aunt Tootie and was deeply affected by being removed from her house. Weekly visits with his aunt were particularly difficult after joining the Knapp family. The psychologist also helped Cory deal with his grief after his Aunt Tootie died. Despite the initial transitional problems, Walsh believes that Cory has done very well in his current foster placement.
On cross examination, Walsh stated that Cory is aware that Adrian is his brother. However, the two children do not have a significant bond primarily because of the difference in their ages. Walsh also believes that Cory has bonded with his mother and that he has an interest in her well being.
Tiffney deeply loves her children and believes that she is capable of parenting Adrian and Cory. In support of her parenting abilities, Tiffney informed the court that her two oldest children, Sarah and Cody, stay with her every week from Thursday evening to Sunday evening. Tiffney testified that she has not used crack cocaine since October 2000. However, the record reflects that she has admitted to two relapses since becoming involved with CSB and she has not dropped a urine sample for drug screening since January 2001.
Several witnesses for CSB testified regarding Tiffney's failed attempts to complete any type of drug treatment while her children have been in the temporary custody of CSB. Tiffney has participated in the treatment programs of at least five different agencies and was unable to receive a certificate of completion from any of the programs. Tiffney believes that her relationship with Travis, scheduling conflicts and other people are responsible for her missed appointments and failures in treatment. Tiffney's counselors and case workers informed her that sobriety was directly related to her goal of reunification with her children. However, throughout Tiffney's involvement with CSB, her primary focus has been on her relationship with Travis, Adrian's biological father. Long described Tiffney's behavior regarding Travis as a classic example of codependency. The record reflects that Tiffney is currently residing with Travis.
Tiffney has attended supervised visits with her children once a week for two hours for the entire time her children have been in the temporary custody of CSB. Throughout the first few visitations, Tiffney focused almost exclusively on Adrian completely ignoring Cory. After a CSB case worker discussed the importance of spending time with both children, Tiffney divided her time at visitations equally between Adrian and Cory. Tiffney and Travis brought snacks and toys to the visits and exhibited appropriate behavior with Cory and Adrian. However, throughout the 20 month-period the visits did not increase in length or frequency and never advanced beyond supervised visitations at the visitation center.
Mrs. Knapp recorded Adrian's behavior in a daily diary to assist his therapists. At the weekly visitations, she made numerous attempts to share her information and experiences regarding Adrian's special needs with his biological parents. Tiffney and Travis were not willing to accept that Adrian was experiencing any developmental or behavioral problems. They believed that Adrian was a simply a baby and that there "was nothing wrong with their baby."
Tiffney has never witnessed any seizures or alarming behaviors during their visitations. However, she is no longer in denial about Adrian's special needs and is willing to accept the neurologist's diagnosis. Tiffney believes that she would be able to properly care for Adrian if given the opportunity to learn the various techniques described by the occupational therapist. The occupational therapist testified that a layperson could learn the calming protocol of brush therapy and deep pressure. She has never met the biological parents but stated that Adrian's routine could be learned if his primary caregiver was able to program herself accordingly.
Tiffney's friend from church and Travis's nephew and fiancée testified they would be willing to offer help and support in raising the children. Travis's nephew and fiancée have attended several visitations with Adrian and are aware of his special needs. However, they were both unaware that Travis had a previous conviction for drug possession.
Tiffney and Travis are currently sub-leasing a small apartment together. Tiffney testified that she was unsure of the duration of the sub-lease or whether the lease was going to be transferred into her name. When CSB was first involved with Tiffney, she was evicted from her Akron Metro Housing Authority ("AMHA") housing because she was three months delinquent on her rent. Furthermore, Tiffney violated the AMHA rules by allowing Travis, a convicted felon, to live in AMHA housing. Between December 2000 and May 2001 Tiffney was homeless and lived at an access shelter. While her children have been in the temporary custody of CSB, she has also stayed with her mother, her sister and Travis's nephew.
Attorney Payne, the guardian ad litem, recommended that the permanent commitment was in the children's best interest. He testified that Cory's primary wish is to live with his mother. However, if reunification with his mother is not possible, Cory wants to stay with his foster family. Attorney Payne stated that Adrian is making great strides with his foster family. He is putting words together and moving away from signing as his sole means of communication. However, Adrian still requires a great deal of monitoring.
After the initial adjustment period, Cory has settled into the Knapp family and his new surroundings. Cory experienced separation issues and loss issues at an early age. He needs stability and permanency in his life. Specifically, Cory needs to know "who he is going to go home to every night * * * [and] who sets the guidelines in his life and the parameters that he has to live within."
After a careful review of the evidence, we find that the trial court's determination that the children were in the temporary custody of the agency for more than twelve of the last twenty-two months and that it was in the children's best interests that they be placed in the permanent custody of CSB was supported by clear and convincing evidence. Tiffney's first assignment of error is overruled.
 Tiffney's Second Assignment of Error THE TRIAL COURT FAILED TO MAKE INQUIRY OF OR ISSUE A FINDING REGARDING THE FATHER OF CORY JORDAN, THUS THE FINDING OF PERMANENT CUSTODY IS IN ERROR[.]
 Tiffney's Third Assignment of Error THE ADJUDICATION OF CORY JORDAN WAS FLAWED IN THAT NO SERVICE HAD BEEN DONE ON THE FATHERS AND THE BIFURCATED ADJUDICATORY HEARING HAD NEVER BEEN COMPLETED.
Tiffney's second and third assignments of error are related and will be considered together for ease of discussion. Tiffney argues that the award of permanent custody is in error because the court did not inquire as to whether Cory could be placed with Kasserman, Cory's biological father. Furthermore, Tiffney asserts that the juvenile court did not have jurisdiction over the termination of parental rights because the court never held a separate adjudication as to Kasserman. We disagree.
On appeal, Kasserman filed a brief with this court and did not raise as error his service, his right to a separate adjudication or waiver of his rights to custody of Cody. Tiffney attempts to assert his arguments on appeal. This court has held "an appellant may not challenge an alleged error committed against a non-appealing party absent a showing that she herself has been prejudiced by the alleged error." In re Rackley (Apr. 8, 1998), Summit App. No. 18614, unreported, at 5.
In the present case, Kasserman is an appealing party, however, he chose to not raise these alleged errors. Therefore, absent a showing that Tiffney was actually prejudiced by these alleged errors, she lacks standing to raise the issues. See In re Goggins (July 29, 1998), Summit App. No. 18820, unreported, at 9. We find that Tiffney has failed to demonstrate actual prejudice and we overrule her second and third assignments of error.
 Tiffney's Fourth Assignment of Error THE TRIAL COURT ERRED IN ITS DETERMINATION THAT THE CHILDREN WERE NOT CHILDREN SUBJECT TO THE INDIAN CHILD WELFARE ACT.
Tiffney argues that the juvenile court erred when it found that neither Cory nor Adrian was subject to the provisions of the Indian Child Welfare Act ("ICWA"). In essence, Tiffney challenges the jurisdiction of the trial court, arguing that the trial court did not have jurisdiction over the proceedings because the court never sent notice to a tribe, as required by the ICWA. We disagree.
The ICWA provides certain procedural safeguards in child custody proceedings when the subject child is an Indian child, as defined in Section 1903, Title 25, U.S. Code. The ICWA was enacted due to the increasing concern over the large number of Native American children that were being placed in non-Native American foster or adoptive homes. See Section 1901(4), Title 25, U.S. Code. The ICWA provides, in part:
 [i]t is the policy of this Nation to protect the best interests of Indian children and to promote the stability and security of Indian tribes and families by the establishment of minimum Federal standards for the removal of Indian children from their families and the placement of such children in foster or adoptive homes which will reflect the unique values of Indian culture[.]
Section 1902, Title 25, U.S. Code. Subchapter 1 of the ICWA is applicable to this case because it addresses child custody proceedings and proceedings that terminate parental rights. In re Sanchez (Dec. 10, 1999), Trumbull App. No. 98-T-0104, unreported.
A tribe has exclusive jurisdiction over child custody proceedings in situations in which the Native American child resides or is domiciled within its reservation. Section 1911(a), Title 25, U.S. Code. However, when a subject child does not reside on a reservation, child custody proceedings may be initiated in a state court. Section 1911(b), Title 25, U.S. Code. In these situations, the state court, "in the absence of good cause to the contrary, shall transfer such proceeding to the jurisdiction of the tribe." Id. Notice must be given to the tribe "[i]n any involuntary [child custody] proceeding in a State court, where the court knows or has reason to know that an Indian child is involved[.]" Section 1912(a), Title 25, U.S. Code.
In order for any of the provisions of the ICWA to apply, the court must first determine that the child is an "Indian child" as defined in the ICWA. See Section 1912(a), Title 25, U.S. Code; In re J.D.B. (Iowa Ct.App. 1998), 584 N.W.2d 577, 582. The burden rests on the party who asserts the applicability of the ICWA to prove that the child meets the definition. In re J.D.B., 584 N.W.2d 577, 582. See, also, Hofmann v.Anderson (2001), 176 Or. App. 311, 315, 31 P.2d 510, 512. An Indian child is defined as "any unmarried person who is under age eighteen and is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe[.]" Section 1903(4), Title 25, U.S. Code.
In this case, Tiffney had the burden to prove that the children met the statutory criteria required for the ICWA to apply. It is not contested that the children are under the age of eighteen and are unmarried. Thus, the first prong of the statutory definition is met. The second prong may be met either by proving the child is (a) a member of a tribe or (b) eligible for membership and is the biological child of a member of a tribe. See Section 1903(4), Title 25, U.S. Code. We must first determine if either of the children is a member of a tribe. Tiffney testified that she believed her family had Native American ancestors. However, she admitted that her children are not registered with any tribe. Thus, neither of the children is a member of a tribe.
We must now determine if either of the children is eligible for membership and is the biological child of a member of a tribe. Because this requirement is in the conjunctive, both prongs must be met. Therefore, Tiffney must demonstrate that at least one biological parent is a member of a tribe and that the children are eligible for membership. Tiffney believed her father was a Cherokee Indian but did not know whether her father was an actual member of a tribe. She also testified to the belief that her grandmother on her mother's side of the family was Cherokee. Tiffney stated that her half-sister was a member of a tribe, although Tiffney could not state which one. She admitted that she never registered herself as a member of a tribe. Therefore, Tiffney is not a member of a tribe.
Travis, Adrian's biological father, testified that he thought he has a Native American background. He stated he never took any steps to register either himself or Adrian with a tribe and neither of them is a member. Therefore, Adrian does not fit the definition of an Indian child pursuant to 25 U.S.C. § 1903 because he is not the biological child of a member of a tribe. The ICWA does not apply to the proceeding as to the custody of Adrian.
Kasserman, Cory's biological father, made no claim of Native American ancestry. Kasserman is not a member of a tribe. Therefore, the ICWA does not apply to the proceeding as to Cory either. The trial court did not err when it found that the ICWA did not apply to this proceeding. Tiffney's fourth assignment of error is overruled.
 Tiffney's Fifth Assignment of Error THE TRIAL COURT ERRED IN ITS DETERMINATION THAT CSB HAD MADE REASONABLE EFFORTS TO PREVENT THE CONTINUED REMOVAL OF THE CHILDREN FROM THEIR MOTHER.
In her fifth assignment of error, Tiffney suggests that CSB was required to prove, at the permanent custody hearing, that it had exerted reasonable efforts to prevent the continued removal of her children. As this court noted in In re Thompson (Jan. 10, 2001), Summit App. No. 20201, unreported, at 12, "it is R.C. 2151.419 that requires the agency to prove to the trial court `at any hearing held pursuant to [the statutes providing for the child's removal from the home]' that it made reasonable efforts to prevent removal of the children and to work toward reunification." As in In re Thompson, the record in this case reveals that when the trial court adjudicated the children dependent and placed them in the temporary custody of CSB, it approved and adopted a finding by the magistrate that CSB made reasonable efforts to prevent the continued removal of the children from the home.
The prior order, dated December 23, 1999, was a final and appealable order, but Tiffney failed to timely appeal that order. See In re Murray
(1990), 52 Ohio St.3d 155, syllabus; In re Thompson (Jan. 10, 2001), Summit App. No. 20201, unreported, at 12. This court is without jurisdiction to reach the issues disposed of at that time. Accordingly, Tiffney's fifth assignment of error is overruled.
 III. Kasserman's Assignment of Error THE TRIAL COURT ERRED IN TERMINATING THE PARENTAL RIGHTS OF APPELLANT BRIAN KASSERMAN WITHOUT QUALIFICATION THAT SHOULD THE COURT'S DECISION BE REVERSED AND THE CAUSE REMANDED[,] BRIAN KASSERMAN SHOULD BE PERMITTED TO REMAIN A PARTY TO THE CASE[.]
In his sole assignment of error, Kasserman maintains that the trial court erred when it failed to qualify his voluntary termination of parental rights as to his son, Cory. Kasserman agrees with the judgment of the trial court that the granting of permanent custody of Cory to CSB was in Cory's best interest. However, Kasserman claims he relinquished his parental rights with a qualification that if the court denied the motion for permanent custody or if a judgment granting permanent custody was reversed, he would retain the right to be a part of further custody proceedings. Our disposition of Tiffney's assignments of error renders Kasserman's assignment of error moot. Kasserman's sole assignment of error is overruled.
 IV.
Having overruled Tiffney's five assignments of error and Kasserman's assignment of error, we affirm the judgment of the trial court.
Judgment affirmed.
The Court finds that there were reasonable grounds for this appeal.
We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.
Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(E).
Costs taxed to Appellant.
Exceptions.
BATCHELDER, J., WHITMORE, J. CONCUR.
[1] Mark McBride is the biological father of Tiffney's two oldest children, Sarah and Cody. McBride has legal custody of Sarah and Cody.
[2] CHC was formerly known as the Community Drug Board.
[3] The record reflects that Travis Williams ("Travis"), Adrian's biological father, initially appealed the trial court's decision to grant permanent custody to CSB. This court dismissed his appeal.
[4] The record reflects that Adrian tested negative for the presence of cocaine at the time of his birth.
[5] The record reflects that Cory spent the majority of his young life living with his aunt. In fact, he attended a school in Aunt Tootie's school district not in Tiffney's school district. Cory began living primarily with his Aunt Tootie sometime in 1996 after Tiffney and McBride separated. At the hearing, Tiffney was unable to recall the specific reason why she sent Cory to live with his aunt.